**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Ronald Jermaine Jackson (1),

Defendant.

Case No. 19-cr-185(1) (SRN/KMM)

**REPORT AND RECOMMENDATION**

---

Justin A. Wesley, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis MN 55415 (for the government); and

Lauren Campoli, Lauren Campoli PLLC, 900 IDS Center, 80 South Eighth Street, Minneapolis MN 55402 (for Defendant Ronald Jermaine Jackson).

---

This matter is before the Courton Defendant Ronald Jermaine Jackson's Motion to Suppress Unnecessarily Suggestive Show-Up Identification. (ECF No. 53). This motion has been referred for a report and recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held September 12, 2019, and the government offered the testimony of Brooklyn Park Police Officers Michael Stahnke, Jeffrey Thomas, and Robert Anderson. (ECF No. 69; Tr. of Sept. 12, 2019 Mot. Hrg, ECF No. 74). The Court received into evidence Def. Ex. 1, a one-page document entitled "Officer's Field Card of Show-Up Identifications." Pursuant to discussions at the hearing, the government later submitted into evidence Gov't Ex. 1, a USB drive containing squad and body camera videos from Officers Stahnke, Thomas, and Anderson, as well as store surveillance

footage. Post-hearing briefing is now complete, (ECF Nos. 79, 84), and the Court recommends that Jackson's motion be denied.

## I. FINDINGS OF FACT

On the morning of April 30, 2019, two men robbed a T-Mobile store in Brooklyn Park, Minnesota wearing reflective yellow construction vests and dark-colored winter hats over dreadlocked hair. (Gov't Ex. 1, Entrance.avi at 00:00–00:13; Gov't Ex. 1, SuspectsEnter.avi at 00:03–00:20; *see* Tr. 6:17–7:1, 10:23–11:5, Tr. 9:9–10:7). The first man to enter the store was African-American, and wore a gray sweatshirt, jeans, and boots. (Gov't Ex. 1, Entrance.avi at 00:00–00:13; Gov't Ex. 1, SuspectsEnter.avi at 00:03–00:20; Gov't Ex. 1, Backroom.avi at 00:08–00:23). The second man, who was also black, wore a dark-colored sweatshirt or jacket, dark sweatpants with vertical white striping along the side, dark sneakers, and a backpack. (Gov't Ex. 1, Entrance.avi at 00:00–00:13; Gov't Ex. 1, SuspectsEnter.avi at 00:03–00:20; Gov't Ex. 1, Backroom.avi at 00:08–00:23).

The man wearing the gray sweatshirt removed a pistol from his sweater pocket as he entered the store. (Gov't Ex. 1, Entrance.avi at 00:00–00:13; Gov't Ex. 1, SuspectsEnter.avi at 00:03–00:20). The man with the backpack removed a pistol from around his waistband as he neared Mr. Coleman, a store employee manning the service counter nearest the store entrance. (Gov't Ex. 1, Entrance.avi at 00:00–00:13; Gov't Ex. 1, SuspectsEnter.avi at 00:03–00:20). The man with the gray sweatshirt walked past Mr. Coleman directly towards Mr. Kirk, the other employee on duty at that time. (Gov't Ex. 1, SuspectsEnter.avi at 00:03–00:20). Both employees were escorted to a backroom of

the store at gunpoint. (Gov't Ex. 1, SuspectsEnter.avi at 00:03–00:20; Gov't Ex. 1, Backroom.avi at 00:08–00:23). During the walk towards the store's backroom, the man with a backpack put on a disposable dust mask which covered his mouth and nose. (Gov't Ex. 1, SuspectsEnter.avi at 00:03–00:20).

The two employees, Mr. Coleman and Mr. Kirk, were brought through the store's backroom to the room containing the store safe. (Gov't Ex. 1, Backroom.avi at 00:08–00:23; Gov't Ex. 1, Saferoom.avi at 00:06–05:07). Once inside, they sat on the floor while the man wearing the gray sweatshirt secured their hands behind their backs and restrained their legs with zip ties. (Gov't Ex. 1, Saferoom.avi at 00:06–05:07). During this process, the man with a backpack started filling bags with contents from the store safe, including a traceable "bait phone" used to track robbers. (Gov't Ex. 1, Saferoom.avi at 00:06–05:07). Both suspects left the vault after approximately five minutes, each carrying two bags and exiting through the store's rear door. (Gov't Ex. 1, Backroom.avi at 05:21–05:28). The man with the backpack returned approximately 30 seconds later and very briefly looked at a storage case in the store's backroom before exiting a final time. (Gov't Ex. 1, Backroom.avi at 05:55–06:05). The two men were in the store for approximately six minutes total. (Tr. 10:13–17).

After the robbery, Brooklyn Park Police Officer Michael Stahnke and Sergeant Palmquist responded to the T-Mobile store. (Tr. 6:17–7:1, 10:23–11:5; Stahnke Body Cam[1] *passim*). Prior to arriving, Officer Stahnke was informed by dispatch that two

[1] Stahnke Body Cam is found at Gov't Ex. 1, BPPD Squad_BWC of Ofcr Stahnke, DVR BWC_238.

employees had been tied up in the store vault and suspects with guns had fled. (Tr. 7:2–5). The two employees were able to free themselves prior to law enforcement arriving on the scene. (Tr. 7:6–12; *see* Stahnke Body Cam at 10:15:45–10:18:30).

Officer Stahnke and Sergeant Palmquist arrived and encountered Mr. Coleman and Mr. Kirk. (Tr. 12:11–19; Stahnke Body Cam at 10:15:45–10:18:30). The two witnesses were separated and interviewed. (Tr. 13:2–7; Stahnke Body Cam at 10:16:05–10:18:30). Officer Stahnke spoke with Mr. Kirk while Sergeant Palmquist spoke with Mr. Coleman. (Tr. 7:13–19, 13:2–7, 13:22–14:1, 19:11–20:8; Stahnke Body Cam at 10:16:05–10:18:30). Mr. Kirk told Officer Stahnke that the two suspects wore constructions vests, and one wore a gray sweater and held a black handgun with a silver slide. (Tr. 7:20–8:8, 15:4–18, 24:16–22; Stahnke Body Cam at 10:16:05–10:20:05).

A few minutes after arriving, Sergeant Palmquist left to respond to a nearby Fleet Farm where law enforcement had encountered two men whom they believed to be the T-Mobile robbers. (Tr. 12:20–23; Stahnke Body Cam at 10:18:30–10:18:45). Using the bait phone, law enforcement had tracked the two suspects to a parked vehicle at Fleet Farm; the suspects fled from the vehicle. (Tr. 54:20–55:12, 72:16–25; *see* Anderson Squad Video No. 1[2] *passim*; Anderson Body Cam No. 1[3] *passim*). Law enforcement found items taken from the T-Mobile store and disguises worn by the two suspected robbers inside the vehicle after the suspects ran. (Tr. 54:20–55:12).

---

[2] Anderson Squad Video No. 1 is found at Gov't Ex. 1, BPPD Squad_BWC_01 of 04, DVR 1669.
[3] Anderson Body Cam No. 1 is found at Gov't Ex. 1, BPPD Squad_BWC_01 of 04, DVR XV_204.

After Sergeant Palmquist left the T-Mobile store, Officer Stahnke continued to speak with Mr. Kirk and Mr. Coleman together about the robbery. (Tr. 13:8–15:3; Stahnke Body Cam at 10:18:45–10:28:30). When Officer Stahnke asked the race of the suspects, both Mr. Kirk and Mr. Coleman reported they were black, then Mr. Coleman said one had dreadlocks while Mr. Kirk reiterated that he thought both suspects had dreadlocks. (Stahnke Body Cam at 10:26:14–10:26:30; Tr. 7:20–8:8, 15:23–16:17, 19:11–20:8, 24:23–25:11). Neither Mr. Kirk nor Mr. Coleman were able to describe any facial features of the two suspects, only clothing descriptions. (Tr. 16:1–4, 20:24–21:2).

The store manager arrived and showed Officer Stahnke the store surveillance video. (Tr. 8:9–16, 16:18–17:5, 25:19–26:17; Stahnke Body Cam at 10:30:55–10:48:15, 10:53:30–10:55:09). Officer Stahnke began review of the surveillance video while Mr. Kirk, Mr. Coleman, and the store manager remained nearby. (Tr. 17:3–18:16, 25:19–26:17; Stahnke Body Cam at 10:30:55–10:34:54). Officer Stahnke believed the surveillance video depiction of the two suspects matched the descriptions offered by Mr. Kirk and Mr. Coleman. (Tr. 8:17–10:17). Officer Stahnke could not see the suspects' faces from the angle of the video. (Tr. 18:17–19:3, 20:14–21:2, 21:9–24:15).

About 15 to 20 minutes after the robbery, two law enforcement officers were sent to pick up Mr. Kirk and Mr. Coleman and bring them to the Fleet Farm for show-up identifications of the two suspects. (Tr. 71:24–72:3). Officer Jeffrey Thomas was charged with picking up Mr. Kirk. (Tr. 38:4–23, 42:14–16; *see* Stahnke Body Cam at 10:34:15–

10:34:54; Thomas Body Cam[4] at 10:34:15–10:35:20). Officer Thomas explained to Mr. Kirk that law enforcement had two individuals in custody that may or may not be responsible for the robbery. (Thomas Squad Video[5] at 10:40:08–10:40:48; Tr. 39:7–22). Mr. Kirk was told to take to look at two individuals to see if they were or were not the men who had robbed the store. (Thomas Squad Video at 10:40:08–10:40:48). Officer Thomas reiterated that the two individuals could be involved in the robbery or they could not be involved. (Thomas Squad Video at 10:40:08–10:40:48). Officer Thomas stated that Mr. Kirk's identification would be his own and that Officer Thomas would not influence the identification process in any manner regardless of whether or not Mr. Kirk recognized the two persons; there was no pressure to identify the individuals. (Thomas Squad Video at 10:40:08–10:40:48; Tr. 40:1–11). Officer Thomas was issued an officer's field card for show-up identifications at some point in the past but he could not find it for use when discussing the procedure with Mr. Kirk. (Tr. 43:3–44:3, 45:13–46:5).[6] Instead, he instructed Mr. Kirk from memory.

---

[4] Thomas Body Cam is found at Gov't Ex. 1, BPPD Squad_BWC_02 of 04, DVR BWC_149.

[5] Thomas Squad Video is found at Gov't Ex. 1, BPPD Squad_BWC_03 of 04, DVR 1636. The parties agree that this file is mistakenly credited as coming from Officer Chris Kleven.

[6] A one-page sheet was ultimately located in the Brooklyn Park Police Department entitled "Officer's Field Car for Show-Up Identifications." (Def. Ex. 1). It includes guidelines for an effective show-up and instructions to be read to witnesses. (Def. Ex. 1). The instructions are:

1. You are going to be asked to view some people (even if only on person is shown).
2. The person you saw may or may not be among the people you are about to view.
3. It is just as important to clear innocent persons from suspicion as it is to identify the guilty.
4. Regardless of whether you identify someone, we will continue to investigate the incident.
5. If you identify someone, I will ask you to state, in your own words, how certain you are.
6. If you do select someone, please do not ask us questions about the person you have selected, because we cannot share that information with you at this time.
7. Regardless of whether you select a person, please do not discuss the procedure with any other witnesses in the case or the media.
8. Do you have any questions before we begin?

Officer Robert Anderson was tasked with bringing Mr. Coleman to the Fleet Farm to conduct a show-up of the two suspects. (Tr. 54:13–55:21; Anderson Body Cam No. 2[7] at 10:34:59–10:36:25; Anderson Squad Video No. 2[8] at 10:39:31–10:40:53; *see* Stahnke Body Cam at 10:34:15–10:34:54). Officer Anderson explained the process to Mr. Coleman as follows: law enforcement stopped a couple of people who may or may not be involved in the robbery and he was driving Mr. Coleman to take a look at them. (Anderson Body Cam No. 2 at 10:36:25–10:37:40; Anderson Squad Video No. 2 at 10:40:54–10:42:13; Tr. 56:2–13). Mr. Coleman could tell Officer Anderson that the persons were involved or were not involved. (Anderson Body Cam No. 2 at 10:36:25–10:37:40; Anderson Squad Video No. 2 at 10:40:54–10:42:13; Tr. 56:2–13). Officer Anderson asked Mr. Coleman to tell him exactly what he was thinking and what he remembered. (Anderson Body Cam No. 2 at 10:36:25–10:37:4; Anderson Squad Video No. 2 at 10:40:54–10:42:130). And Officer Anderson told Mr. Coleman he was under no obligation to identify anybody. (Anderson Body Cam No. 2 at 10:36:25–10:37:40; Anderson Squad Video No. 2 at 10:40:54–10:42:13). Officer Anderson could not locate his show-up identification field card while providing instructions to Mr. Coleman so, like Officer Thomas, he instructed Mr. Coleman from memory. (Tr. 57:3–19, 61:4–17, 63:20–64:14, 70:7–71:17; Anderson Body Cam No. 2 at 10:36:25–10:37:40; Anderson Squad Video No. 2 at 10:40:54–10:42:13).

If an identification is made, ask: “Without using a numerical scale, how certain are you?” (Def. Ex. 1).

[7] Anderson Body Cam No. 2 is found at Gov’t Ex. 1, BPPD Squad_BWC_02 of 04, DVR XV_204.

[8] Anderson Squad Video No. 2 is found at Gov’t Ex. 1, BPPD Squad_BWC_03 of 04, DVR 1669.

Officers Thomas and Anderson arrived at the Fleet Farm parking lot at the same time for the show-ups.[9] (Thomas Squad Video at 10:45:17–10:46:37; Tr. 40:12–14, 47:2–4). William Charles Graham, Mr. Jackson's codefendant, was removed from a marked squad car by one uniformed police officer while wearing handcuffs. (Anderson Squad Video No. 2 at 10:45:17–10:45:32; Thomas Squad Video at 10:45:17–10:46:37; Tr. 40:15–24, 47:5–48:21; Tr. 57:20–58:3). Officer Thomas told Mr. Kirk to disregard the handcuffs as not meaning anything. (Thomas Squad Video at 10:45:25–10:45:28; Tr. 40:25–41:2). Mr. Kirk advised that he was drawn to Mr. Graham's gray sweatshirt but could not positively identify the individual with 100% certainty. (Thomas Squad Video at 10:45:17–10:47:59, 10:53:12–10:53:50; Tr. 41:3–12, 48:22–49:12). In the other squad car, Mr. Coleman asked Officer Anderson to get a little closer so he could better see Mr. Graham. (Tr. 57:20–58:3; Anderson Body Cam No. 2 at 10:40:48–10:41:01; Anderson Squad Video No. 2 at 10:45:33–10:45:42). When Mr. Coleman got closer he identified Mr. Graham, mentioning his gray shirt. (Tr. 57:20–58:13, 59:9–11, 65:25–67:4; Anderson Body Cam No. 2 at 10:41:10–10:42:00; Anderson Squad Video No. 2 at 10:45:43–10:46:29).

The two officers then drove to the other side of the Fleet Farm building for the show-up of Ronald Jackson. (Tr. 41:20–22, 49:23–50:4). Mr. Jackson was removed from a marked squad car—with flashing emergency lights—by two uniformed officers while handcuffed. (Anderson Squad Video No. 2 at 10:48:10–10:48:55; Thomas Squad Video

[9] To be clear, Officer Thomas was in one car with Mr. Kirk while Officer Anderson was in a separate car with Mr. Coleman. The two pairs never interacted during the show-ups of the two suspects.

at 10:48:20–10:49:27; Anderson Body Cam No. 2 at 10:42:10–10:43:37; Tr. 50:7–20; Tr. 58:14–19). Mr. Kirk stated that he believed Mr. Jackson was not involved in the robbery because he did not have dreadlocks and was taller than Mr. Graham. (Thomas Squad Video at 10:48:20–10:49:27, 10:53:12–10:53:50; Tr. 41:23–42:7, 50:21–51:6). As for Mr. Coleman, Officer Anderson reminded him that he was under no obligation to identify anyone. (Anderson Body Cam No. 2 at 10:43:38–10:44:50; Anderson Squad Video No. 2 at 10:48:10–10:48:55). Mr. Coleman also could not identify Jackson, referencing the suspects' height and attire. (Tr. 58:20–59:17, 67:5–68:16; Anderson Squad Video No. 2 at 10:48:55–10:49:24; Anderson Body Cam No. 2 at 10:43:38–10:44:50). While looking at Mr. Jackson, Mr. Coleman indicated that Mr. Graham, whom he had seen first, was definitely involved. (Anderson Squad Video No. 2 at 10:48:55–10:49:24; Anderson Body Cam No. 2 at 10:43:38–10:44:50). While Officer Anderson was speaking with other police officers outside his squad car, Mr. Coleman spoke with someone on the phone, telling them he thought police caught one of the suspects but that he could not identify the second suspect. (Anderson Squad Video No. 2 at 10:50:30–10:52:25).

## II. ANALYSIS

The Court first notes that the government has indicated it will not seek an in-court identification of Mr. Jackson from Mr. Kirk or Mr. Coleman. (ECF No. 84, at 12). Instead, the government will only seek testimony from Mr. Kirk, Mr. Coleman, and other witnesses about the show-up identifications. And it is that testimony which Mr. Jackson seeks to exclude under the Due Process Clause.

### A. Legal Standard

The Supreme Court has recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012); *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (the "likelihood of misidentification" is what "violates a defendant's right to due process" with respect to a suggestive out-of-court identification); *United States v. Rodriguez*, 581 F.3d 775, 810 (8th Cir. 2009) ("Identification procedures, if impermissibly suggestive, violate Due Process." (citing *Foster v. California*, 394 U.S. 440, 442 (1969))). Determining whether an out-of-court identification should be suppressed under the Due Process Clause involves a two-step inquiry. First, courts determine whether the confrontation was impermissibly suggestive. *United States v. Shumpert*, 889 F.3d 488, 491 (8th Cir. 2018) (quoting *Graham v. Solem*, 728 F.2d 1533, 1541 (8th Cir. 1984) (en banc)). If so, courts must determine whether, under the totality of the circumstances, the suggestive confrontation created a substantial likelihood of irreparable misidentification. *Shumpert*, 889 F.3d at 491 (quoting *Graham*, 728 F.2d at 1541); *Biggers*, 409 U.S. at 199; *United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998) ("A crime victim's identification of the defendant is admissible unless it is based upon a pretrial confrontation between the witness and the suspect that is both impermissibly suggestive and unreliable.").

**B. Suggestiveness**

"Police officers need not limit themselves to station house line-ups when an opportunity for a quick, on-the-scene identification arises. Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary." *King*, 148 F.3d at 970; *see also United States v. Mitchell*, 726 F. App'x 498, 501 (8th Cir. 2018). The Eighth Circuit has observed that the "[n]ecessary incidents of on-the-scene identifications, such as the suspects being handcuffed and in police custody," do not necessarily require the suppression of a resulting identification. *King*, 148 F.3d at 970.

The Eighth Circuit has repeatedly concluded that in-person show-ups like the one performed here are not per se impermissibly suggestive, but instead require a consideration of the totality of the circumstances. In *United States v. Pickar*, the show-up identification was not unduly suggestive where "Pickar was handcuffed and standing in front of a marked police cruiser," "stood between an officer in uniform and an officer in plainclothes, with one of the officers shining a small flashlight in [his] face," and had been transported by police back to the scene of the bank robbery. 616 F.3d 821, 827–28 (8th Cir. 2010). And in *United States v. Martinez*, the Eighth Circuit concluded the same for similar circumstances to those in *Pickar*: Mr. Martinez was handcuffed, driven back to the bank in a police car, and police officers were present. 462 F.3d 903, 911 (8th Cir. 2006).

In this case, the specific circumstances of the identification procedures used supports a finding that they were not unduly suggestive. Had the witnesses positively

identified both suspects in the show-ups described above, the Court would have had to closely examine the circumstances to determine whether the procedure used was unduly suggestive, even against the permissive framework contained in *Pickar* and *Martinez*. Here, two separate suspects were shown to two witnesses while in full and dramatic police custody very shortly after an armed robbery. However, an important reality in this case mitigates the concerns of *undue* suggestion. Here, neither witness positively identified Mr. Jackson as having been involved in the robbery.[10] This important fact demonstrates that, regardless of the circumstances of the show-up proceedings, neither Mr. Kirk nor Mr. Coleman found them so suggestive or coercive as to compel a positive identification about which they otherwise might have been uncertain. *See, e.g. Graham*, 728 F.2d at 1541 (describing the "corrupting effect" of a suggestive proceeding on the resulting identification). Indeed, the fact that both store employees felt free to indicate that they could *not* identify Mr. Jackson as one of the robbers strongly suggests that the procedures used, under the totality of the circumstances, did not unfairly tip the balance in favor of law enforcement and against the defendant. And the Court is unaware of precedent suggesting that an identification procedure where the witness declines to identify the suspect should be suppressed as unduly suggestive.

---

[10] The government asserts that Mr. Coleman identified both Mr. Graham and Mr. Jackson, while Mr. Kirk identified only Mr. Graham. Mr. Jackson asserts that neither witness positively identified him. To the extent it matters, this Court agrees with Mr. Jackson—Mr. Coleman never identified Mr. Jackson as having participated in the robbery, but instead started discussing the suspects' height and clothing generally while looking at Mr. Jackson. Moreover, while Mr. Coleman was waiting in the police car he was recorded telling someone on the phone that he could not identify the second suspect, suggesting that he believed he had not given a positive identification moments earlier.

Perhaps the suggestiveness of the show-ups in this case was offset by the robust introductions that both Officers Anderson and Thomas gave to the witnesses before arriving at Fleet Farm. In both cases, the witnesses were told that the suspects may or may not be responsible for the robbery and that there was no requirement to identify anyone.[11] Mr. Coleman and Mr. Kirk were given free rein in responding to each show-up and Officers Anderson and Thomas asked open-ended questions to solicit additional responses. Officers Anderson and Thomas did not guide or pressure the store employees to identify the suspects. In sum, although the Court can imagine a similar procedure being found unduly suggestive, the unique facts of the show-ups involving Mr. Jackson undermine such a conclusion here.

Because the Court concludes that the show-ups involving Mr. Jackson were not unduly suggestive in this case, the Court need not pivot to the other part of the due process analysis, which requires consideration of whether the identification was reliable despite the suggestiveness. Indeed, it would be difficult to conduct the needed assessment where, as here, the witnesses did not positively identify Mr. Jackson at all. Nonetheless, the Court observes that several of the factors set forth in *Neil v Biggers*, such as the witnesses' opportunity to view the robbers, their degree of attention, their accurate descriptions of the two suspects' attire, and the promptness of the show-up would weigh heavily in favor of admissibility of the related evidence in this case. 409 U.S. at 199. The

[11] Mr. Jackson emphasizes that neither officer read the official show-up advisory that they should have carried on their persons much like a *Miranda* advisory card. While both Officers Thomas and Anderson both testified that they were issued field cards regarding show-ups in the past, Mr. Jackson points to no authority that any specific advisory language is required prior to a show-up identification procedure, and the Court is aware of no such authority.

witnesses were with the robbers for several minutes, with close-up opportunities to view them, though the robbers' faces were somewhat obscured by disguises. And both witnesses provided details evincing careful attention when they described the robbers. If the Court determined that the show up had been unduly suggestive, the totality of the circumstances surrounding the case would nonetheless weigh in favor of admitting the identification or non-identification of Mr. Jackson.

## III. RECOMMENDATION

For these reasons, **IT IS HEREBY RECOMMENDED** that Defendant Ronald Jermain Jackson's Motion to Suppress Unnecessarily Suggestive Show-Up Identification, (ECF No. 53), be **DENIED**.

Date: December 5, 2019

*s/ Katherine M. Menendez*
Katherine M. Menendez
United States Magistrate Judge
District of Minnesota

*United States v. Jackson (1)*
Case No. 19-cr-185(1) (SRN/KMM)

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.