## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 19-cr-185(1) (SRN/KMM) |
| Plaintiff, | |
| v. | **ORDER** |
| Ronald Jermaine Jackson (1), | |
| Defendant. | |

Amber Brennan, Justin Wesley, and Nathan Nelson, United States Attorney's Office, 600 U.S. Courthouse, 300 S. 4th St., Minneapolis, MN 55415, for the Government

Ronald Jermaine Jackson, Sherburne County Jail, 13880 Business Center Dr. NW, Elk River, MN 55330, Pro Se Defendant

Lauren Campoli, 900 IDS Center, 80 S. 8th St., Minneapolis, MN 55402, Standby Counsel for Defendant

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Ronald Jermaine Jackson's Motion for Reconsideration of Detention Denial/Release ("Motion for Release") [Doc. No. 179]. The Government filed a response in opposition to Jackson's Motion for Release, (Gov't's Opp'n [Doc. No. 184]), to which Jackson filed a reply (Reply [Doc. No. 196]). Based on a review of the file, record, and proceedings herein, and for the following reasons, the Court denies the Motion for Release.

## I.  BACKGROUND

### A.  Procedural and Factual Background

On July 16, 2019, the Government charged Jackson and co-defendant William Charles Graham with interference with commerce by robbery in violation of 18 U.S.C. § 1951(b)(1), (Indictment [Doc. No. 1]), Count 1), and using, carrying, and brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  (*Id.*, Count 2.)  The Government contends that Jackson faces a mandatory minimum sentence of 84 months on Count 2, consecutive to any sentence that may be imposed on Count 1.  (Gov't Opp'n at 2–3.)  In addition, the Government believes that if Jackson is convicted on both counts at trial, his Sentencing Guidelines range will be 135–147 months in prison, based on a preliminary estimated offense level of 23 for Count 1, and a criminal history category of II.  (*Id.* at 3.)

At the July 23, 2019 hearing on the Government's motion for pretrial detention, the Court ordered that Jackson be detained.  (Order of Detention [Doc. No. 27] at 3–4.)  At the hearing, ATF Special Agent David Carriker offered testimony.  (July 23, 2019 Court Minutes [Doc. No. 23].)  In the Order of Detention, Magistrate Judge Steven Rau made the following findings regarding the charges in this case:

> The alleged offense in this case is a Hobbs Act Robbery of a T-Mobile Store in Brooklyn Park, Minnesota, on April 30, 2019. Special Agent Carriker testified that two men entered the store brandishing what appeared to be firearms. They forced the two store employees to the back of the store, zip tied them, and fled the store with over 70 cell phones. One of the cell phones had a tracking device installed, and within minutes the Brooklyn Park Police Department had located the phones in the parking lot of a Fleet Farm, near the T-Mobile store.  When officers arrived at the Fleet Farm, they passed a Kia that was parked, with the engine running, and

observed a man who appeared to be crouched down, attempting to avoid being seen. After officers passed the Kia, they observed them both. The men were Graham and Jackson. Inside the Kia, officers recovered, among other things, the stolen cell phones, Graham's driver's license, and the disguises the two robbers had been wearing in the store (fake dreadlocks, reflector vests, and dust masks). They also recovered two firearms from the car – one was a BB gun, and the other was a .380 caliber semi-automatic pistol. After reviewing some of the surveillance from the T-Mobile store, Special Agent Carriker believes Jackson was holding the .380 and Graham was holding the BB gun.

(Order of Detention at 2–3.)

Magistrate Judge Rau also noted that U.S. Pretrial Services had prepared a bond report containing Jackson's criminal history and a recommendation for detention. (*Id.* at 1–2.) In the Order of Detention, the magistrate judge noted in particular Jackson's prior conviction for kidnapping in 2015, which involved the same codefendant as in this case, William Graham. (*Id.*) During that prior offense, Graham and Jackson forced a Verizon employee into the trunk of a car, zip tied him, drove around, attempted to extract the keys to the Verizon store from the victim, and eventually parked near the victim's residence, leaving him in the trunk. (*Id.*) For this offense, Jackson was sentenced to 48 months in prison. (*Id.* at 2.)

In ordering Jackson's detention, Magistrate Judge Rau found that in light of the nature of the instant charges, Jackson's previous kidnapping offense, as well as the Pretrial Services report, Jackson had failed to rebut the presumption of detention under 18 U.S.C. § 3142(e). (*Id.* at 2–3.) Moreover, even if Jackson had rebutted the presumption, the magistrate judge found that no condition or combination of conditions would assure the

safety of the community if Jackson were released, and Jackson presented a flight risk if he were released.  (*Id.* at 3.)

### B.  Parties' Arguments and Evidence

Jackson remains in detention in the Sherburne County Jail ("the Jail") pending trial. Given the COVID-19 pandemic, he seeks release.  (Def.'s Mot. at 1.)  Jackson argues that the Eighth Amendment's proscription against cruel and unusual punishment warrants his release.  (*Id.* at 1; Reply at 3.)

The Government opposes Defendant's motion.  (Gov't's Opp'n at 1.)  It observes that Jackson does not challenge the Court's prior findings that no conditions of release would assure the safety of the community and Defendant's appearance at future proceedings, but instead seeks release based on the COVID-19 pandemic. (*Id.* at 2.)  The Government contends that the COVID-19 pandemic is not a valid basis for such relief, and granting Defendant's release would "ignore[] the demonstrated capabilities of the Sherburne County Jail to meet this challenge."  (*Id.*)

In response to Defendant's concerns about COVID-19 and the safety of conditions in the Jail, the Government submits the Affidavit of Brian Frank, dated March 25, 2020 (the "Frank Aff." [Doc. No. 184-1]).[1]  Mr. Frank is the Jail Administrator of the Sherburne County Jail, and supervises the operations of the facility.  In his affidavit, Frank details the

---

[1]    The Court notes that in response to a more recently filed motion brought by another Sherburne County Jail inmate, the Government filed an updated affidavit from Brian Frank, dated April 17, 2020.  *See United States v. Hernandez-Guevara*, 18-cr-299(2) (SRN/BRT), 2020 WL 1951902, at *2 (D. Minn. Apr. 23, 2020).  Because the information in the April 17, 2020 Frank Affidavit is equally relevant here, the Court refers to it, as applicable.

general background, structural safety, operational safety, and medical safety of the Jail, as well as the efforts taken to facilitate detainees' ability to consult with counsel.  Frank notes that at present, there are no known cases of COVID-19 in the Jail.  (Frank Aff. ¶ 3.)[2]   In light of the pandemic, the Jail has "proactively modified its already stringent safety and cleaning measures," by placing new inmates in a 14-day quarantine that is isolated from the general population and monitored by licensed medical professionals.  (Id.)  Any inmates reporting illness are seen by a licensed medical provider who performs a general medical assessment and administers a Coronavirus Screening Checklist.  (*Id.*, Ex. 1 (Coronavirus Checklist).)  Frank states that if an inmate presents confirmed symptoms of illness, staff will place the inmate into medical isolation.  (Frank Aff. ¶ 3.)

In terms of the Jail's structural safety, Frank states that the Jail is designed to contain an airborne threat and prevent it from spreading throughout the facility.  (*Id.* ¶ 6.)  If necessary, the Jail can isolate into 12 distinct sectors or "smoke zones."  (*Id.*)  To do so, the Jail's nine separate air exchange units can be calibrated to bring in a certain percentage

---

[2]     Nor were there any known cases as of April 17, 2020.  *Hernandez-Garcia*, 2020 WL 1951902, at *2 (citing Apr. 17, 2020 Frank Aff. [Doc. No. 188-1] ¶ 4.)  Moreover, in response to inmates' concerns about the pandemic, on April 1 and 2, 2020, Frank listened to their concerns, and told them about the additional safety measures the Jail has implemented and continues to review as a result of COVID-19.  *Id.*

Frank also states that one of the first responsive measures undertaken by the Jail was to reduce the inmate population. *Hernandez-Garcia*, 2020 WL 1951902, at *2 (citing Apr. 17, 2020 Frank Aff. ¶¶ 7–8).  Jail administrative staff are working with federal agencies, including ICE and the U.S. Marshal's Service, to limit the number of detainees and inmates. *Id.* On March 16, 2020, the total Jail population (including ICE detainees and inmates) was 606.  *Id.* ¶ 8. As of April 10, 2020, the total Jail population was down to 450. *Id.*

of fresh air, while exhausting the same amount of air from inside the Jail. (*Id.*) The return air passes through a MERV-8 filter before entering the Jail. (*Id.*) Within a given zone, this ventilation system is able to recycle up to 100% of the air with fresh air. (Id.)[3] The Jail can control the percentage variable, which is typically set at approximately 20%. (*Id.*) In light of COVID-19 safety measures, the Jail has adjusted the value for all zones to 80%. (*Id.*) Because of the Jail's understanding that the virus is transmitted primarily through water particles, it believes that "this ventilation system is imperative to minimizing potential exposure within the Jail community." (*Id.*) The Jail monitors the ventilation settings in all zones and will adjust them as necessary. (*Id.*)

Frank observes that the Jail has 24 units designated to quarantine new arrivals to the facility. (*Id.* ¶ 7.) New inmates are housed in these dedicated units for 14 days. (*Id.*) During this period of isolation, licensed medical providers monitor and screen the new inmates for any signs or symptoms of illness. (*Id.*) If an inmate displays such signs of illness, licensed medical providers examine and treat the inmate accordingly. (Id.)[4]

---

[3]   In the April 17, 2020 Frank Affidavit, Frank clarifies that certain cold weather conditions do not permit a 100% exchange level. *Hernandez-Guevara*, 2020 WL 1951902, at *2 (citing Apr. 17, 2020 Frank Aff. ¶ 11).

[4]   Frank reports in his more recent Affidavit that in addition to the Coronavirus Screening Checklist, as part of the screening process, the Jail's medical clinic is able to test inmates for Influenza A and B and for strep throat. *Hernandez-Guevara*, 2020 WL 1951902, at *2 (citing Apr. 17, 2020 Frank Aff. ¶ 11). Any new or existing inmate who tests positive for these illnesses is placed in a medical isolation cell, if directed by medical staff. *Id*. The Jail also has three negative pressure cells that may be used, in which the air is mechanically ventilated to general negative pressure to prevent contaminated air from escaping. *Id*. (citing April 17, 2020 Frank Aff. ¶ 13).

In addition, Frank states that the Jail has a separate space for inmates who are diagnosed with an illness by a medical professional, and the space is separate from the quarantine units for new arrivals. (*Id.* ⁋ 8.) Only after a medical professional deems it safe for the inmate to return to the general population does an inmate return. (*Id.*)

Frank further states that the Jail has contingency plans in the event that COVID-19 is present in the Jail. (*Id.* ⁋ 9.) Under this plan to isolate and control any such outbreak, the Jail will designate entire areas for isolated housing, or establish a special housing unit for inmates who test positive for the virus. (*Id.*) The Jail also has three negative-pressure units in which it could treat severely symptomatic inmates. (*Id.*) Such units are mechanically ventilated to generate negative pressure and prevent contaminated air from escaping. (*Id.*)

As to the Jail's operational safety, Frank states that staff constantly monitor the COVID-19 pandemic and modify procedures accordingly. (*Id.* ⁋ 10.) The Jail reviews daily updates from the Center for Disease Control and Prevention ("CDC") and implements guidance specifically tailored to a correctional facility environment. (*Id.*) In addition, three

---

While the Jail itself lacks the ability to test for COVID-19, if an inmate shows symptoms of the virus, and influenza and strep have been eliminated, Jail administration defers to medical staff regarding whether the inmate should be transported to a hospital or clinic for additional testing. *Id.* (citing Apr. 17, 2020 Frank Aff. ¶ 12). If testing is unavailable, the Jail will place the inmate in medical isolation or other housing, as directed by medical staff. *Id.* As of April 17, 2020, only one inmate has been sent for testing, with negative test results. *Id.* If an inmate is transported for testing and is awaiting test results, the Jail will place the inmate in medical isolation and consult with Jail medical staff and the Minnesota Department of Health ("MDH"). *Id.* (citing Apr. 17, 2020 Frank Aff. ¶ 14).

days a week, the Jail participates in a teleconference with the Minnesota Department of

Corrections to discuss COVID-19 and best practices to ensure inmate safety.  (Id.)[5]

Frank also asserts that the Jail "maintains rigorous and routine cleaning, sanitation,

and hygiene procedures."  (Id. ¶ 11.)[6]  The Jail cleans all frequently-touched surfaces in

housing units four times daily with a virus-killing chemical, and additionally cleans

housing units before every meal and the nightly lockdown.  (*Id.*)  Hallways are cleaned and

disinfected three times daily and floors are cleaned once a day.  (*Id.*)  Finally, Jail staff

have shared CDC guidance on proper handwashing techniques and social distancing with

inmates.  (*Id.* ¶ 12.)[7]  Jail staff monitor and enforce this guidance as necessary.  (*Id.*)

---

[5]    Jail administration believes that the measures and procedures it has put in place meet or exceed those of other correctional facilities in Minnesota.  *Hernandez-Guevara*, 2020 WL 1951902, at *3 (citing Apr. 17, 2020 Frank Aff.   ¶ 6).   In response to an inmate complaint, on April 10, 2020, the Inspection and Enforcement Unit of the Minnesota DOC recently reviewed the Jail's increased safety measures and procedures.  *Id.* The inspector concluded that "[t]he steps taken by Sherburne County Jail Administration exceed the prevention measures being taken in correctional facilities across the state and do not violate any Rule provision."  *Id.*

[6]    The Jail has also retained a contractor to assist in sanitizing touchpoints in the Jail, including housing units.  *Hernandez-Guevara*, 2020 WL 1951902, at *3 (citing Apr. 17, 2020 Frank Aff. ¶ 19).  The contractor began on April 7, 2020 and will work three times per week.  *Id.*

[7]    Frank reports that with respect to social distancing measures and handwashing standards, the Jail has adopted the following procedures: (1) reducing the number of inmates allowed out of their cells at any given time to half of the population; (2) inmates rotate where they will eat on alternate days, with half of the population eating in their cells, and the other half eating in the dayroom, and inmates are responsible for picking up and returning their own meal trays to eliminate interactions with corrections officers; (3) reducing the number of hours that inmates may be outside of their cells; and (4) posting signs in all housing units with guidance on proper handwashing procedures.  *Hernandez-Guevara*, 2020 WL 1951902, at *3 (citing Apr. 17, 2020 Frank Aff. ¶ 20).  All of these

Frank also asserts that medical staff facilitate and monitor the 14-day quarantine of new arrivals at the Jail.  (*Id.* ¶ 14.) Staff administer the Coronavirus Screening Checklist and continue to monitor new arrivals throughout the 14-day quarantine period, including by monitoring body temperature on a daily basis.  (*Id.*)  Only after a new arrival completes the 14-day quarantine is he or she allowed to enter the general population.  (*Id.*)  The Jail's medical staff likewise monitor any inmates in the general population who complain of illness or exhibit symptoms.  (*Id.* ¶ 15.) Staff administer the Coronavirus Screening Checklist, complete medical assessments, and provide any necessary care.  (*Id.*)  Care may include a protective surgical mask, routine care, or placement in isolation.  (*Id.*)

As to the Jail's staffing complement, Frank states that currently, only essential employees are working at the facility in order to limit the potential exposure to illness within the Jail.  (*Id.* ¶ 16.)[8]  Supervisory staff actively monitor essential staff members,

---

measures have been undertaken to minimize contact between staff and inmates.  *Id.* (citing Apr. 17, 2020 Frank Aff.¶ 21). Jail staff have also consulted with the MDH about social distancing strategies and have followed the agency's recommendation to adopt a conservative approach regarding inmate movement and in-person contact.  *Id.*

The Jail has also modified delivery systems within housing units to reduce unnecessary person-to-person contact.  *Id.* (citing Apr. 17, 2020 Frank Aff. ¶ 23). The Jail now utilizes the following procedures: (1) inmates may receive commissary deliveries, but only to individual cells after evening lockdown; (2) inmates may access their legal carts when they are otherwise allowed to be outside their cells; (3) medication delivery for non-dormitory housing units is done in the main hallway of a unit, using a pass-through door, and medical staff who dispense medication have been required to wear a mask and a face shield or goggles since April 5, 2020; and (4) the exchange of clothing is similarly conducted through a pass-through door.  *Id.*

[8]     More recently, Frank stated that the following procedures have been enacted to limit the chances of contamination or cross-contamination: (1) as of April 6, 2020, Jail staff work 12-hour shifts with seven days on, and seven days off, during which time they may

who are screened every time they enter the Jail with a body-temperature check and the Coronavirus Screening Checklist. (*Id.*) If an employee shows any symptoms of illness, the employee is denied admission onto the premises. (*Id.*)

In addition, regarding the ability of inmates to consult with defense counsel, Frank states that while concerns about COVID-19 have caused the Jail to temporarily discontinue contact visits, inmates retain the ability to consult with defense counsel. (*Id.* ¶ 17.) All inmates and counsel may use video visitation in the common areas of the housing unit, which is neither recorded nor expressly monitored. (*Id.* ¶ 18.) In limited circumstances, the Jail may be able to accommodate a request for greater privacy, but hopes that such accommodations are unnecessary, in light of other opportunities for interactions between inmates and defense counsel. (*Id.*) With prior Court approval, the Jail also facilitates video teleconferencing for inmates to appear for court appearances. (*Id.* ¶ 19.) The Jail also is committed to facilitating interactions between inmates and defense counsel before, during, and after court appearances. (*Id.*)

---

self-quarantine and monitor for any signs of illness; (2) all Jail staff are screened with a body-temperature check and the Coronavirus Screening Checklist every time they arrive at work; (3) the Jail provides electronic briefings to staff at the beginning of shifts, as opposed to face-to-face briefings; (4) during an entire seven-day work period, Jail staff are assigned to only one of three work zones, having a separate entry point for each zone, with the exception of "rovers," or if the need arises to enter a different zone in the event of an emergency; (5) as of April 4–5, 2020, Jail staff are following updated CDC guidelines to wear masks while inmates are out of their cells, and staff are attempting to augment their supply of surgical and N95 masks; and (6) as of April 6, 2020, the Jail received a supply of cotton-style barrier masks, and again, based on guidance from the Minnesota DOC and MDH, staff were instructed to wear the masks when inmates are out of their cells. *Hernandez-Guevara*, 2020 WL 1951902, at *4 (citing Apr. 17, 2020 Frank Aff. ¶ 24).

In his Reply, Jackson asserts a variety of arguments that he also raises in his pending Motion to Dismiss concerning probable cause and the validity of the Indictment, as well as purported Eighth Amendment violations based on the amount of time he must spend in his cell due to the pandemic.  (Reply at 1–3.)

## II.    DISCUSSION

### A.  Motion for Release

When making a detention determination under 18 U.S.C. § 3142, courts consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community, and the risk of flight, which the defendant's release would pose.  18 U.S.C. 3142(g).  As noted earlier, because Jackson is charged with brandishing a firearm in further of a crime of violence, in violation of 18 U.S.C. § 924(c), there is a rebuttable presumption in favor of detention.  18 U.S.C. § 3142(e)(3)(B).

As to whether the COVID-19 pandemic presents a change in circumstance that supports reopening the detention hearing under 18 U.S.C. § 3142(f), or an "exceptional reason" making Jackson's continued detention inappropriate under 18 U.S.C. § 3145(c), the Court finds that it does not. Under § 3142(f), a detention hearing may be reopened if the Court determines that there is information, unknown to the movant at the time of the prior hearing, that has a "material bearing" on the issue of whether there are conditions of release that will assure the defendant's appearance in court and the safety of the community.  Under § 3145(c), a defendant may be ordered released "if it is clearly shown

that there are exceptional reasons why such person's detention would not be appropriate." Also, while the Court notes that a defendant may obtain temporary release when "necessary for preparation of the person's defense or for another "compelling reason," 18 U.S.C. § 3142(i), Jackson seeks indefinite release on bond and fails to present a compelling reason under the facts of his case.

While the Court is sympathetic to Jackson's concerns about the possibility of contracting COVID-19, such concerns have no bearing, much less "material bearing," under § 3142(f), on the question of Defendant's risk of flight and the safety of the community, under these facts. *See United States v. Jones*, No. 1:17-cr-00582-CCb-2, 2020 WL 1323109, at *1 (D. Md. Mar. 20, 2020) (denying motion for release of detainee exposed to COVID-19 at another detention facility, despite detainee's underlying health issues including pregnancy, because such considerations were not the sole determinant of whether detention was appropriate under § 3142(g) factors); *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020) (denying relief under § 3142(f), finding that COVID-19 pandemic did not constitute information material to the question of defendant's particular risk to the public).

In July 2019, applying the factors of § 3142(g), including the nature of the instant charges as well as Jackson's previous kidnapping offense, Magistrate Judge Rau found that Jackson failed to rebut the presumption in favor of detention. (Order of Detention at 3.) Moreover, even if Jackson had rebutted the presumption, the magistrate judge still found that the Government had shown that no conditions of release would assure the safety of the community or assure Jackson's appearance in court. (*Id.*) Jackson offers no explanation

for how his concerns about contracting COVID-19 impact the Court's prior determination about his risk of flight and the safety of the community. Accordingly, there is no basis for reopening the detention hearing under § 3142(f). No hearing is warranted.

Nor does Defendant's concern about the pandemic constitute an exceptional reason warranting release under § 3145(c), or make temporary release "necessary" under § 3142(i). Defendant's concern is too generalized and speculative in nature, as he simply states, (Def.'s Mot. at 1), "I am trying to prevent my body from severe injury. The exposure rate is at an all time high. I would like to be in the comfort of my own home where the risk level is extremely lower." *See United States v. Winchester*, No. 18-cr-301(1), 2020 WL 1515683, at *5 (M.D.N.C. Mar. 30, 2020) (denying request for release in wake of COVID-19 pandemic, and finding that the defendant failed to address the circumstances at the facility in which he was detained, and instead extrapolated "from far-flung situations in the broadest of broad-brush strokes[.]").

To the extent that Jackson is more specific, he refers to the lack of PPE worn by staff, "unsanitary conditions," "close quarters," the lack of safe hatch doors to lessen contact with staff, the transfer of inmates, and goings and comings of staff. (Def.'s Mot. at 1.) However, his concerns are rebutted by the Frank Affidavit and the updated information in the April 17, 2020 Frank Affidavit, filed in *Hernandez-Guevara*, 18-cr-299(2) (SRN/BRT) [Doc. No. 188-1]. The Jail has provided detailed information about the significant steps it has undertaken to prevent and mitigate the risks posed by COVID-19 to inmates' health and safety. As noted, the Jail quarantines and monitors incoming detainees for a 14-day period, and provides screening and medical care to any current

inmates who exhibit signs or symptoms of illness.  As to Defendant's concern about PPE, the Coronavirus Screening Checklist calls for the use of masks for any inmates who appear to exhibit signs of COVID-19 or who are at greater risk of having the virus.  (*See* Checklist [Doc. No. 184-1 at 10].)  The Checklist also advises correctional officers to wear a mask when in the cell of an infected inmate or when encountering them, including when "opening the food-slot door."  (*Id.*)  More recent measures demonstrate that the Jail is reducing staff/inmate contact in a variety of ways, including staffing shifts for seven days on, seven days off, and, as of April 4–5, 2020, having staff wear masks while inmates are out of their cells.  *Hernandez-Guevara*, 2020 WL 19519-2, at *4 (citing Apr. 17, 2020 Frank Aff. ⁋ 24).

As of this writing, all of these steps appear to be successful, as there have been no reported incidents of COVID-19 within the Sherburne County Jail.  *See United States v. Blegen*, No. 19-cr-304 (SRN/TNL), 2020 WL 1619282, at *2, 5 (D. Minn. Apr. 2, 2020) (noting absence of reported cases in Sherburne County Jail); *United States v. Morris*, No. 17-cr-107(01) (DWF/TNL), 2020 WL 1471683, at *4  (D. Minn. Mar. 26, 2020) (noting, as of March 26, 2020, "zero reported cases of COVID-19 in the jail."); *see also United States v. Pate*, No. 8:17-cr-00236-PWG-1, 2020 WL 1694368, at *3 (D. Md. April 7, 2020) (noting that the detention facility had enacted comprehensive measures to avoid an outbreak and combat the virus); *United States v. Hamilton*, No. 19-cr-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (stating, "perhaps most importantly, as of this writing, there have been no reported incidents of COVID-19 within [defendant's detention facility], and the Bureau of Prisons is taking system-wide precautions to mitigate

the possibility of infection within its facilities.  As such, given the risks that [defendant's]

release would pose, the court concludes that the possibility of an outbreak at [his detention

facility] is not a 'compelling circumstance' justifying his release.").

Furthermore, Jackson does not represent that he has a medical condition that places

him at greater risk with respect to COVID-19 than the rest of the population.  *See United*

*States v. Sanders*, No. 19-20037-01-DDC, 2020 WL 1528621, at *4 (D. Kan. Mar. 31,

2020) (noting that the defendant has no elevated personal risk factors for COVID-19, and

may actually be at greater risk outside the prison).  The risk created by the pandemic is not

unique to Defendant, and exists in society at large.  *See, e.g., United States v. West*, No.

20-MJ-5073 TLF, 2020 WL 1550624, at *3 (W.D. Wash. Apr. 1, 2020) (noting that risk

of exposure to COVID-19  applies to "any person in our community at this time"); *United*

*States v. Kerr*, No. 18-cr-296-L, 2020 WL 1529180, at *3 (N.D. Tex. Mar. 31, 2020)

(stating that fear of COVID-19 outbreak is not unique to the defendant in particular, and is

not an "exceptional circumstance."); *United States v. Cornish*, No. 20-cr-3-GFVT-MAS,

___ F. Supp. 3d ___, 2020 WL 1498841, at *5 (E.D. Ky. Mar. 30, 2020) (finding that

because COVID-19 is prevalent in the community at large, any difference in health risks

to detained population was minimal); *United States v. Jackson*, No. 18-cr-216, 2020 WL

1445958, at *2 (W.D. Pa. Mar. 24, 2020) (finding it speculative to presume that COVID-

19 was present or imminent in jail, and noting that potential exposure exists anywhere in

the wider community).

As to the argument that Jackson's continued confinement violates the Eighth

Amendment's prohibition against cruel and unusual punishment, (*see* Def.'s Mot. at 1;

Reply at 3), the Court disagrees.  Given all of the bases for Jackson's detention and no evidence that the Jail is unable to effectively monitor or treat him should he contract COVID-19, along with a lack of evidence showing that Jackson is at higher risk of contracting COVID-19 in general, or a higher risk while in custody than if he were released, the Court finds no evidence of deliberate indifference to his medical needs in violation of the Eighth Amendment.  *See United States v. McDonald*, No. 2:19-cr-00312-KJD-VCF, 2020 WL 1659937, at *3 (D. Nev. April 3, 2020) (finding no Eighth Amendment basis for temporary release under § 3142(i), in light of grounds for detention, no evidence that the place of confinement is unable to treat the defendant, and lack of evidence that defendant is at higher risk of contracting COVID-19 in custody than if he were released).

In sum, Defendant's concerns concerning COVID-19 do not constitute a compelling reason under § 3142(i) for temporary release, a material change in circumstance under § 3142(f) to warrant the reopening of the detention hearing, or an "exceptional reason" under § 3145(c) to justify his release from the Sherburne County Jail.  *See Blegen*, 2020 WL 1619282, at *4 (finding COVID-19 pandemic did not create exceptional reason for release from Sherburne County Jail); *Morris*, 2020 WL 1471683, at *4  (finding, as to a defendant housed in the Sherburne County Jail who cited age and poor health, that COVID-19 pandemic did not constitute an exceptional reason for release); *United States v. Quijada*, No. 19-cr-276 (DSD/TNL), (D. Minn. Mar. 20, 2020 [Doc. No. 32]) (finding COVID-19 pandemic was not an exceptional reason warranting release from Sherburne County Jail). Nor has Jackson demonstrated that his continued detention presents a constitutional

violation.  *See McDonald*, 2020 WL 1659937, at *3 (rejecting defendant's constitutional arguments for temporary release in light of COVID-19.)

## III.   CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.   Defendant's Motion for Reconsideration of Detention Denial/Release [Doc. No. 179] is **DENIED**.

.

Dated: April 29, 2020

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge